**Affirmed and Memorandum Opinion filed September 21, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00244-CV

## IN THE INTEREST OF M.D., A CHILD.

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2018-03447J**

## MEMORANDUM OPINION

Appellant D.D. ("Father") appeals the trial court's final order terminating his parental rights to his child M.D. ("Madeline").[1] The trial court terminated Father's parental rights on the predicate grounds of endangerment, failure to comply with the service plan for reunification, and violation in connection with a court-ordered substance abuse treatment program. Tex. Fam. Code § 161.001(b)(1)(E), (O) & (P). On appeal, Father challenges the legal and factual sufficiency of the evidence to support (1) the predicate ground of endangerment, and (2) the finding that

---

[1] We use pseudonyms or initials to refer to appellant, the child, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

termination of his parental rights is in Madeline's best interest.

Father does not challenge on appeal whether other findings listed in the final order as grounds for termination of his parental rights provide a proper basis for the predicate act required under section 161.001(b)(1), so the determination as to whether the trial court erred in terminating Father's parental rights hinges only on the challenged finding that termination of Father's parental rights is in Madeline's best interest. *See Interest of P.W.*, 579 S.W.3d 713, 720–21 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Yet, even if we reject Father's challenges to the best-interest finding, we have the power to grant an appropriate appellate remedy if we sustain Father's challenge to the endangerment finding under subsection (E), and this appellate remedy would preclude the Department of Family and Protective Services ("Department") from using the trial court's termination order as a basis for a subsection (M) finding in a future case seeking termination of Father's parental rights as to another child. *See Interest of P.W.*, 579 S.W.3d 713, 717 (Tex. App.—Houston [14th Dist.] 2019, no pet.). We conclude that the evidence is legally and factually sufficient to support the jury's best-interest finding and that the evidence is legally insufficient to support the endangerment finding under subsection (E). Therefore, we modify the judgment to delete the endangerment finding under subsection (E), and we affirm the judgment as modified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Department's Investigation

At the time of Madeline's birth, the child's mother ("Mother") named Father as the child's biological father. On the day of Madeline's birth, the Department received a call to investigate Mother for neglectful supervision based on Mother's positive drug tests throughout her pregnancy with Madeline. The supporting

2

affidavit reveals Mother's history with the Department. It shows that none of Mother's six other children (including Innes, another child of Mother and Father) lived with Mother, that courts had terminated Mother's parental rights to three of those children based on Mother's failure to demonstrate an ability to provide a safe, stable, and drug-free environment. Drug testing during Mother's pregnancy with Madeline, taken in connection with the Department's open case involving Innes, showed Mother's persistent use of drugs.

According to the affidavit, Father "expressed interest in paternity" but refused to sign Madeline's birth certificate. He later explained that he was unaware of the pregnancy and did not learn of Madeline until her birth. The affidavit notes that several days after Madeline's birth, Father told the investigator that he had "tested positive for cocaine and had to take classes."

The Department sought and obtained an emergency order giving the Department custody of Madeline. The Department placed six-day old Madeline in the care of intervenors S.O. and J.O. ("Foster Parents"). The same day the Department initiated the underlying action seeking to terminate the parental rights of both Mother and Father.

The Department filed a family service plan for Father on August 3, 2018, when Madeline was about two months old. The trial court signed an order approving the plan on August 9, 2018. The family service plan addresses Father's admitted substance abuse as well as his denial of current drug use despite positive tests showing it. The court-ordered plan required that Father demonstrate an understanding of and ability to provide for the needs of the child, to put the child's needs ahead of his own needs, and to show a concern for the future safety of the child.

After paternity testing established Father as Madeline's biological father in

August 2018, the child remained in Foster Parents' care without contact or visitation from Father until December 2018. Between February 2019 and the December 2019 trial, the trial court conducted four permanency hearings. During that time, the Department shifted its position with respect to Madeline's placement and changed its goal of family reunification with Father to adoption by Foster Parents.

Foster Parents intervened in the termination suit, joining the Department's suit against Father and Mother, and seeking conservatorship of Madeline.

**B. Trial**

When the parties appeared for trial on the termination of Mother's and Father's parental rights, the Department took the position that it was not seeking termination as between Father and Madeline. Though the Department did not dispute that Foster Parents were suitable for placement, the Department's stated goal at the time of trial was to reunify Madeline with Father. Seeking exclusive conservatorship rights over Madeline, Foster Parents rather than the Department sought termination of Father's parental rights.[2]

At trial various investigators, caseworkers, and service providers testified. Each of these witnesses recognized some shortcoming in Father's completion of the court-ordered service plan. They discussed the frequent permanency-goal changes. The caseworkers who had contact with and observed Foster Parents approved of Foster Parents and their care for Madeline.

*Initial Department Investigator*

Investigator Shaniece Scarborough, assigned to investigate the case against

_____

[2] At trial, the court-appointed child advocate for Madeline, represented by counsel, was aligned with Foster Parents.

4

Mother, provided the show-cause affidavit for the emergency removal. She explained that the Department did not seek to place Madeline with Father based on Father's admission that he had tested positive for cocaine and his undetermined status as Madeline's father and instead placed the child into foster care.

*Department Caseworkers*

Caseworker Ashley Bennett testified that the Department, initially concerned about the Father's positive drug test, considered unrelated adoption at the beginning of the case but the goal changed to family reunification with the Father in May of 2019. Shortly thereafter, the Department learned that Father had tested positive for drugs the same month.

Bennett testified that Madeline appeared to be bonded with Foster Parents and that Father had not bonded with Madeline because he was not visiting the child. According to Bennett, Father asked the Department to consider placing Madeline with his mother, aunt, or sister. The Department investigated these possibilities and eliminated Father's mother as a prospect due to results from a home study. Because Father's sister lived with Father's mother, the Department eliminated this potential placement for the same reason. Father's aunt already was serving as the placement for another child (Innes) and declined.

Caseworker Diane Sabillon, assigned to Father's case in May 2019, advocated for the Department to continue to work with Father toward the goal of family reunification rather than seek to terminate his parental rights. Sabillon testified that Father admitted to her that he had a drug addiction and had relapsed in May 2019, when he tested positive for drug use. According to Sabillon, when she asked Father to submit to a random drug test the month before trial, he refused, telling her that his work schedule would not permit it. Scheduling times for Father to visit Madeline had proved difficult because of Father's employment schedule.

5

Sabillon explained the decision to change the venue for visits with Madeline to Father's home. By the time of trial, Father had visited with Madeline a number of times at his home.

*Program Director*

Program Director Montorea Thomas testified that in August 2019, she assisted in "staffing"[3] the Department's goal change from family reunification to unrelated adoption due to concerns about Father's positive drug tests. But, as of the day of trial, she testified that the Department supported not terminating Father's parental rights and had no evidence that caused the Department to believe that placement with the Father would fail. When asked about Father's failure to take a random drug test the month before trial, Montorea agreed that it was unusual to allow Father to be excused from random drug testing.

*Court-Appointed Child Advocate*

Erika Arguelles, a representative from the Child Advocates testified that the organization had been appointed in Father's prior case with Innes. She testified that Father admitted to abusing drugs in his teenage years but denied recent drug use, and also denied using drugs for the duration of her contact with Father. According to Arguelles, despite these assurances, Father continued to test positive for drugs while under the court-ordered service plan. Arguelles had discussed the February 2018 positive drug test results with Father. Father did not admit to using drugs that caused the positive tests. From Arguelles's perspective, Father never demonstrated a willingness or ability to provide a positive environment for Madeline. Arguelles recommended the termination of Father's parental rights as to Madeline.

---

[3] The Department's witnesses' use of the term "staffing" apparently refers to the staffing of personnel to assist on a case, and occurs when a goal is changed.

Arguelles's attorney called her as a rebuttal witness after Father had testified about his recovery efforts in the Alcoholics Anonymous program. According to Arguelles, that part of Father's testimony was inconsistent with statements he made to her during a visit in July 2019.

*Father*

Father testified about his work, his time with Madeline, his extended support, his relationship with his wife ("Wife")—the mother of his three other children, his drug use, his relationship with Madeline's and Innes's mother (Mother), and his participation in the Alcoholics Anonymous program and the family service plan.

Father reported that he married Wife around 2013 and that he had two children with Wife before they first separated. "I cheated on her," he explained. During that period of separation, he met Mother through a mutual friend. He testified that Mother lived in his apartment with him when the two had their first child together (Innes), the child who went to live with Father's aunt following Father's first case with the Department.

Father testified that he ended his relationship with Mother in March of 2018, when he discovered in court that she was testing positive for illegal drugs. He explained that he and Mother tried to work out a plan to co-parent Innes but that these efforts failed because Mother was using drugs and lying about it. According to Father, he did not know that Mother had become pregnant with Madeline when Father ended his relationship with Mother.

Father and Wife then reunited and had a third child together. That child was a month old at the time of trial. Father explained that he does not live with Wife due to their concerns about his ongoing case with the Department. Father testified that he sees his three children with Wife on the weekends and that he sees Innes

7

"once like every day or every other day."

## Foster Mother

Foster Mother testified that Madeline had been in the care of her family since the child was six days old. Foster Mother explained that she took maternity leave to spend time when Madeline, whom she views as her child and loves as much as Foster Mother's son. Foster Mother testified that Madeline had visits with Father on Mondays and afterward had trouble sleeping.

## Therapist

Therapist Ricardo Mejia testified that he supervised visits between Father and Madeline, beginning on June 12, 2019, and oversaw a total of fourteen visits. Mejia testified that Father was affectionate towards Madeline and Madeline was affectionate towards Father, and that he saw a bond between them. Mejia agreed with the description of Father as responsible. Mejia recognized that Father had missed visits with Madeline, but he stated and that for all the missed visits, Father had a reason.

## Child Psychologist

Intervenors retained child psychologist Dr. Mellor-Crummey, who conducted the assessment of how Madeline was doing in her foster home. She described the attachment between Foster Parents and Madeline as a secure one. In explaining Madeline's extended reaction to returning from visits with Father (as described by Foster Mother), Mellor-Crummey interpreted the behavior to mean that Madeline felt her stability was disrupted. Mellor-Crummey agreed that this cycle could affect Madeline's emotional well-being if it were to continue indefinitely.

## Drug Testing Witness

Bruce Jeffries of National Screening Center testified about the twelve drug tests the company performed relating to Father's case. Jefferies discussed the differences in the data and what they reveal between types of tests taken. He reported six positive and six negative drug tests for Father:

| Date Collected | Type of Test | Substance Tested | Result |
|---|---|---|---|
| July 12, 2017 | Urine | Cocaine, Marijuana, Opiates, Amphetamines | Negative |
| Sept. 21, 2017 | Hair follicle / head | Cocaine, Marijuana, Opiates, Amphetamines | Negative |
| Nov. 16, 2017 | Hair follicle / arm hair | Cocaine, Marijuana, Opiates, Amphetamines | Positive for cocaine |
| Dec. 20, 2017 | Hair follicle / arm hair | Cocaine, Marijuana, Opiates, Amphetamines | Positive for cocaine |
| Feb. 21, 2018 | Hair follicle / arm hair | Cocaine, Marijuana, Opiates, Amphetamines | Positive for Methamphetamines & exposure to marihuana |
| May 16, 2018 | Hair follicle / leg hair | Cocaine, Marijuana, Opiates, Amphetamines | Negative |
| June 21, 2018 | Hair follicle / leg hair | Cocaine, Marijuana, Opiates, Amphetamines | Positive for Methamphetamines & exposure to marihuana |
| July 10, 2018 | Hair follicle / leg hair | Cocaine, Marijuana, Opiates, Amphetamines | Negative |
| August 9, 2018 | Hair follicle / leg hair | Cocaine, Marijuana, Opiates, Amphetamines | Negative |
| November | Hair follicle / leg | Cocaine, Marijuana, | Negative |

| 15, 2018 | hair | Opiates, Amphetamines | |
| Feb. 20, 2019 | Hair follicle | Cocaine, Marijuana, Opiates, Amphetamines | Positive for Cocaine & exposure to marihuana |
| May 23, 2019 | Hair follicle | Cocaine, Marijuana, Opiates, Amphetamines | Positive for cocaine |

Jeffries explained that the positive marijuana results revealed environmental exposure only; none of the test results indicate that Father had ingested marijuana. Jeffries summarized the totality of Father's cocaine usage to be "low" but more than once.

*Termination of Father's Parental Rights*

After counsel's arguments, the trial court submitted the case to the jury to determine whether the predicate grounds of endangerment, compliance with the family service plan, and failure to adhere to alcohol treatment programs were supported in the evidence, and whether termination of Father's parental rights was in Madeline's best interest. The jury found each of the three predicate grounds for termination as to Father and that termination of Father's parental rights was in Madeline's best interest.[4] The trial court signed a final decree on February 20, 2020, and when that decree could not be located, the trial court signed another one on March 12, 2020, terminating Father's rights based on findings under sections 161.001(b)(1)(E), (O) and (P).

## II. ISSUES AND ANALYSIS

[4] Though Mother did not appear, she was represented by counsel at trial and her case was tried with Father's case. With respect to Mother, the jury found that terminating her parental rights was in Madeline's best interest.

## A. Standard of Review

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. See Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental-termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Yet, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*. The evidence is legally insufficient to support the challenged finding if, after conducting this review of the record evidence, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true. *In re J.O.A.*, 283 S.W.3d at 344–45.

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Termination of Parental Rights Based on Predicate Ground of Endangerment under Subsection (E)

By making the subsection (E) finding, the jury determined that Father had engaged in conduct or knowingly placed Madeline with persons who engaged in conduct that endangered Madeline's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). A finding of endangerment under subsection (E) requires evidence that the endangerment resulted from the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination of the parent-child relationship under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer

injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Because Madeline went into foster care immediately after her birth, Father had limited time with Madeline and limited control over her environment. Nothing in the record indicates that Father ever spent an unsupervised minute with Madeline. Against this backdrop, we consider whether the record provides factual support for the endangerment finding.

The record does not contain sufficient evidence of violence to support the conclusion that Father endangered Madeline through violence toward Mother. The Department's program director (Thomas) testified that the Department received allegations that Father had bailed Mother out of jail and there had been domestic violence in the home. Thomas explained that the Department investigated, and after consulting the police department for records of an incident, the Department did not find any evidence that Father bailed Mother out of jail or any evidence of domestic violence. The program director explained that when the Department contacted the person who had made the domestic-violence allegation, that person failed to confirm the occurrence of the alleged incident. Father had no criminal history, and no witness who gave evidence about Father's conduct ever testified that Father had engaged in violence.

The record does not contain proof that Father knew that Mother was pregnant with Madeline when Mother was abusing drugs. The Department's program director (Thomas) agreed that, at some point during Mother's pregnancy,

13

Father knew about Mother's drug use, but she could not report when Father found out about the drug use and did not know if Mother and Father were living together during the pregnancy. The record contains no evidence that Father had knowledge of the pregnancy before Madeline's birth. Father maintained that he and Mother broke up in March 2018, three months before Madeline's birth, because of Mother's continued drug use during their case with their first child (Innes). None of the caseworkers testified that while Mother was pregnant Father knew either that Mother was pregnant or that he knew what Mother was doing between March and June 2018, the period leading up to Madeline's birth. From the time the Department (through Scarborough) first contacted Father while Madeline was a newborn in the hospital, through the time of trial, Father maintained he was unaware that Mother was pregnant until Madeline was born.

Although the record contains evidence that Father failed drug tests during the pendency of the case, no one who observed Father with Madeline (or any of his other children) stated that Father acted inappropriately or appeared impaired by the influence of drugs or alcohol during the visits or that Father engaged in conduct that endangered Madeline or anyone else. The record contains no evidence that Father ever used drugs in the presence of Madeline or exposed Madeline to drugs. The evidence shows that Father's drug use during the pendency of the investigation contributed to Father's failure to complete the service plan, missing visits with Madeline, the Department's shift in permanency goals away from reunification with Father, and delays that permitted Foster Parents to intervene.

Considering all the evidence in the light most favorable to the (E) finding, assuming the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved, being mindful of any undisputed evidence

contrary to the finding, and considering that evidence in our analysis, we conclude that no reasonable factfinder could form a firm belief or conviction that Father engaged in conduct that endangered Madeline's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *Interest of L.C.L.*, 599 S.W.3d 79, 85–86 (Tex. App.—Houston [14th Dist.] 2020, pet. pending.)(en banc) (concluding that evidence of drug use alone, without proof of any causal connection to endangering a child's welfare, is legally insufficient to support a finding that a parent engaged in conduct described in Family Code section 161.001(b)(1)(E)). Thus, the trial evidence stands legally insufficient to support the jury's (E) finding. *See In re J.O.A.*, 283 S.W.3d at 344–45; *Interest of L.C.L.*, 599 S.W.3d 79, 85–86. We sustain Father's first issue to the extent he argues that the evidence is legally insufficient to support the jury's finding under section 161.001(b)(1)(E). *Id.* Having concluded that the evidence is legally insufficient to support this finding, we need not and do not address Father's argument that the evidence is factually insufficient to support the finding.

## C. Best Interest of the Child

Father also challenges the legal and factual sufficiency of the evidence to support the jury's finding that termination of his parental rights is in Madeline's best interest.

Texas courts presume that keeping a child with the child's natural parent serves the child's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). At trial, Foster Parents had the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the best-interest issue. *See In re S.R.*, 452 S.W.3d at 366. The considerations the trier of fact may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the child's desires;

(2) the child's present and future physical and emotional needs;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the person(s) seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

*The child's desires and plans for the child*

Madeline, eighteen months old at the time of trial, was too young to express her desires. Under these circumstances, the fact finder may consider with whom the child has bonded, whether the child is receiving good care in that placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Throughout the course of the entire case, Father spent relatively little time with Madeline. Still, the therapist who supervised the many visits between Madeline and Father concluded that the two shared a bond. Foster Mother testified that Madeline had reacted negatively and distressed when Madeline returned from her Monday visits with Father, and that it

16

took the child over 24 hours to return to normal. Dr. Mellor-Crummy testified that she would expect such a response suggesting that it did not necessarily shed unfavorable light on Father, but that continued disruptions could be detrimental to Madeline. Dr. Mellor-Crummy also testified that Madeline demonstrated a secure attachment to Foster Parents.

The trial evidence showed Father had an adequate home for Madeline, with a room of her own, clothes, and food. The evidence showed Foster Parents provided for Madeline at their home. All who observed the foster family, including Father, made approving statements about Foster Parents' care of Madeline. Both Father and Foster Parents enjoy stable employment and rely on daycare for Madeline while they are working outside their homes. Foster Mother reported steps taken to educate Madeline now and in the future. Father testified that he had aspirations for Madeline, "for her to go to college, for her to be able to study whatever she wants to study, for her to be an outgoing person."

With positive evidence supporting both Father and Foster Parents, the first and sixth *Holley* factors are neutral.

*The child's present and future physical and emotional needs, Father's parenting abilities, assistance programs available, and stability of the home*

The record contains evidence that Father had multiple visits with positive interactions with Madeline, that Father acted appropriately during the visits, and that Father brought items for Madeline's care during visits. Father, however, remained unproven as a live-in parent. He had lost custody of one child for reasons related to substance abuse. Though he had other children with whom he had no restrictions, the record contains scarce evidence of any full-time parenting of these children. The jury reasonably could have concluded from Dr. Mellor-Crummey's testimony that an outcome that merely kept the status quo, resulting in

17

neither termination of Father's parental rights to Madeline nor full custody, could be detrimental to Madeline's emotional well-being, as it would allow for continued disruptions to her routine (through semi-regular scheduled visitations).

Additionally, the record contains evidence that Father failed multiple drug tests, that he delayed recovery from substance abuse, that he relapsed after initiating recovery, and that he refused the Department's near-trial request for a random drug test. Substance abuse can negatively affect one's parenting ability (the fourth *Holley* factor) and also shows an element of instability in the home environment (the seventh *Holley* factor). *In Interest of M.M.-Y.P.*, 01-15-00258-CV, 2015 WL 5074147, at *5 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.).

Arguelles testified that she had been on Father's first case (relating to Innes) which also called for court-ordered services. According to Arguelles, after that case Father was hesitant to attend classes again. The trial record includes evidence that Father delayed participation in services during Madeline's case, and missed regular classes. Arguelles also testified that Father told her he did not have an Alcoholics Anonymous sponsor, contrary to his testimony at trial. Father's record of participation in these court-ordered assistance programs provides evidence that Father would not be receptive to assistance programs in the future, might not take such programs seriously, or that Father might not seek out or take advantage of services that would be beneficial to his parenting and to Madeline's care, safety, and protection.

In light of these considerations, we conclude evidence implicating the second, fourth, fifth, and seventh factors show that termination of Father's parental rights support the best-interest finding.

*The present and future emotional and physical danger to the child*

18

A parent's substance abuse supports a finding that termination is in the best interest of the child. *In re E.R.W.*, 528 S.W.3d at 266. The fact finder can give "great weight" to the "significant factor" of drug-related conduct. *Id.*; *see also Interest of Z.H.*, 14-19-00061-CV, 2019 WL 2632015, at *6 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.)(considering parents' drug use in the context of evaluating the present and future emotional and physical danger to the child). Mellor-Crummey testified about the effects of drug use on attachment, explaining that on-going or reappearing drug use disrupts the availability of the caregiver. According to Mellor-Crumney, the "struggle that happens internally around substance abuse requires that the individual focus on getting the drug, using the drug, recovering from the drug. And so, that then takes away the attention and focus from the caregiving functions from the child."

Because the record contains evidence showing the possibility that Father's drug problem would persist and thus present a future emotional danger to Madeline, the third *Holley* factor supports the factfinder's best-interest finding.

*Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuses for those acts or omissions*

In determining the best interest of the child in proceedings for termination of parental rights, the jury properly may consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The Child Advocate and each of the Department's caseworkers agreed that Father did not comply with the Department's several components of the court-ordered service plan.[5] Most significantly, Father's continued substance abuse and failure to undergo testing

---

[5] Father was a native Houstonian, with a command of the English language and prior experience with service plans, and never suggested that he did not understand the service plan at issue in this case. *See Interest of L.C.L.*, 599 S.W.3d at 87.

violated the court-ordered plan.  Father continued to fail drug tests, which revealed that Father continued to place himself in environments with drug exposure and that he continued to ingest drugs.  Father's pattern of drug abuse reflects a lack concern for Madeline's future safety and well-being.

The eighth *Holley* factor favors the jury's determination that termination of Father's parental rights would be in the child's best interest, and at best, the ninth *Holley* factor is neutral.

### *Summary of Holly Factors*

While the *Holley* factors are not exclusive, and need not all be satisfied to support a best-interest finding, in this case, most of the individual factors weigh in favor of the jury's finding, while the remainder are neutral. We conclude that the evidence is legally and factually sufficient to support the jury's finding that the termination of Father's parental rights is in Madeline's best interest. We overrule Father's second issue.

### III. CONCLUSION

Concluding that the evidence stands legally insufficient to support the predicate finding of endangerment under Texas Family Code section 161.001(b)(1)(E) as to Father, we modify the final order to delete that finding as to Father.  With that modification, we affirm the trial court's final order terminating Mother's and Father's parental rights and appointing Foster Parents as joint managing conservators of Madeline.


/s/     Kem Thompson Frost
        Chief Justice

Panel consists of Chief Justice Frost and Justices Wise and Bourliot.

20